**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Kyle Montagano, being duly sworn, state the following:

**Introduction**

1.     I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am also an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.     I am a Special Agent with the Drug Enforcement Administration ("DEA") assigned to the Providence, Rhode Island District Office within the New England Field Division. I graduated from UMass Boston in 2010 with a Bachelor of Arts degree in Criminal Justice. I was a police officer with the Bridgewater Police Department from 2013 to 2021. From 2016 to 2021, I was assigned full-time to the DEA as a sworn federal Task Force Officer ("TFO"). I have been a Special Agent with DEA since May 2021. Prior to my assignment to the Providence Office, I attended a sixteen-week-long DEA Basic Agent Training Academy in Quantico, Virginia. While at the academy, I received training in drug enforcement investigations including, but not limited to, drug identification, surveillance, undercover operations, communications, interview and interrogation, confidential source handling, evidence handling, firearms, and case development.

3.     As a Special Agent and TFO of the DEA, I am authorized to investigate violations of the laws of the United States, including violations of the federal drug laws in Title 21 of the United States Code.

4.     As a Special Agent and TFO, I have written and/or participated in the execution of numerous search warrants resulting in the seizure of: large quantities of controlled substances; paraphernalia involved in the manufacture and distribution of controlled substances; United States currency; records of narcotics and monetary transactions; and drug

1

customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of cellular phones. I have received extensive specialized training in the field of controlled substance identification, investigation and enforcement.

5.    By virtue of my employment as a police officer and assignment as a DEA Special Agent and TFO, I have performed and continue to perform various duties, including, but not limited to: working in the capacity of a surveillance agent detecting and recording movement of persons known to be or suspected of being involved in illegal drug trafficking; working as a case agent directing the investigation of various illegal drug traffickers and their organizations; and directing investigations involving complex conspiracies.

6.    Through experience and training, I have become familiar with the types and amounts of profits made by drug traffickers and the methods, language, and terms used to disguise illegal activity. I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to effectively market those drugs to customers. I understand illegal drug trafficking often involves the local, interstate, and international movement of illegal drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of drug trafficking among multiple participants including suppliers, customers, distributors and money launderers.

7.    I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am familiar with the manner in which drug traffickers

2

use telephones, coded or slang-filled telephone conversations, text messages, communication apps, and other means to facilitate their illegal activities.

8.      Based on my training and experience, I believe that illegal drugs and drug proceeds are often transported in motor vehicles and that drug traffickers often coordinate such transportation through the use of cellular telephones. Through my training and experience, I have acquired specialized knowledge in the activities of drug traffickers, including their use of residences, businesses, and drug "stash houses," to store and process drugs for distribution and to direct their drug distribution activities. That training and experience has led me to believe that drug traffickers store contraband, as well as other evidence of their crimes such as drug proceeds, cellular telephones, cuff sheets or owe sheets, at their residences, businesses, and stash houses.

## Purpose of Affidavit

9.      I submit this affidavit in support of a criminal complaint and arrest warrant charging Khen Adrian ECHEVESTE (born in January 1995) with distribution of fentanyl in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A).

10.      Based on the facts set forth in this affidavit, there is probable cause to believe that on February 24, 2022 ECHEVESTE distributed fentanyl, which he collected from the New Stop Meat Market located at 1258 Broad Street, Providence, RI 02905.

11.      I am a Special Agent and have conducted this investigation working closely with other DEA Special Agents and law enforcement personnel.  Accordingly, I am familiar with the facts concerning this investigation.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show that there is probable cause for the complaint and search warrant and does not set forth all of my knowledge about this matter.

## Probable Cause

12.      Since August 2021, the DEA has been investigating ECHEVESTE for distribution of controlled substances in violation of 21 U.S.C. § 841 (distribution of controlled substances and

possess with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (the "Target Offenses").

13.     In or about July 2021, federal investigators in Connecticut obtained a warrant to track the location of a cellular telephone used by ECHEVESTE.  On August 1, 2021, the tracking data revealed the ECHEVESTE cell phone was in California. From August 2 to August 6, 2021, the ECHEVESTE cell phone did not emit any tracking data, perhaps because it was shut off. On August 7, 2021, the tracking data revealed that the ECHEVESTE cell phone was in the vicinity of Cranston, Rhode Island.

14.     On August 12, 2021, investigators from Connecticut advised me that a pen register on an associated cell phone showed a call to a Dominos Pizza in Seekonk, MA on August 11, 2021. Additional investigation revealed Dominos delivered an order to Room 160 at the Colonial Inn in Seekonk, that Room 160 was booked by ECHEVESTE, and ECHEVESTE checked out on the morning of August 12, 2021.

15.     On August 13, 2021 investigators determined ECHEVESTE was operating a Toyota Van bearing California Registration 8SYZ732.  Investigators applied for an obtained a federal tracking warrant for said vehicle.  Over the course of the next 45 days, investigators conducted extensive surveillance on ECHEVESTE.

**The February 2, 2022 Drug Transaction**

15.     In this investigation, a confidential source ("CS") has been assisting investigators. This CS has a criminal history, which includes felony drug convictions.  This CS does not have any charges pending and is assisting investigators in exchange for payment.  As set forth below, the CS assisted by performing controlled purchases of suspected controlled substances from ECHEVESTE, and during the course of those purchases investigators maintained surveillance of the CS movements.  At the direction of investigators, the CS utilized, during his interactions with ECHEVESTE, an audio/video recording device.  The CS's cooperation has led to arrest and seizures in separate investigations.  During the course of the CS's cooperation, investigators

have found the CS to be reliable and have corroborated the CS's information to the extent possible.

16.    On February 2, 2022, ECHEVESTE utilizing cellular telephone number 203-508-2253 exchanged a series of text messages and phone calls to the CS to meet for a sample of suspected counterfeit fentanyl-lace pills. ECHEVESTE sent the CS a photograph of what appears to be four ziplocked bags containing numerous blue colored pills portrayed as Oxycodone 30mg. ECHEVESTE instructed the CS to met him at the Autozone located at 79 Elmwood Avenue, Providence, RI. (Investigators were in the CS's company when he communicated with ECHEVESTE.) At this time the CS and the CS's vehicle were searched for contraband which was negative. The CS was equipped with an audio/video recording device. Surveillance was then established in the area of 79 Elmwood Ave., Providence, RI.

17.    At approximately 7:42 pm, the CS arrived at the Autozone parking lot and investigators physically and electronically observed ECHEVESTE enter the passenger seat of the CS's vehicle. Investigators electronically observed ECHEVESTE reach into his left pocket and hand the CS 10 blue colored pills. During the meeting, ECHEVESTE instructed the CS to drop him off at his residence. At approximately 7:49 pm, the CS agreed and investigators followed the CS and ECHEVESTE to 27 Warren Street, Providence, RI. Investigators physically and electronically observed the CS and ECHEVESTE enter a side door adjacent to the driveway of the house labeled "27". Investigators further electronically observed ECHEVESTE lead the CS to a basement apartment, where ECHEVESTE showed the CS four bags of blue colored pills. Investigators noted that the pills ECHEVESTE was currently showing the CS appeared to be the same pills in the same bags ECHEVESTE had texted a picture of earlier that day.

18.    At approximately 7:53 pm, the CS exited ECHEVESTE residence and met with investigators at a pre-determined location, where the CS relinquished custody of the 10 pills to investigators. The CS and the CS's vehicle were searched again for contraband which was negative.

19.     During a debriefing of the CS, the CS stated ECHEVESTE brought the CS to a basement apartment located at 27 Warren Street Providence, RI.  ECHEVESTE had shown the CS four (4) plastic bags which contained numerous blue colored pills.  The CS believed these were the same pills ECHEVESTE had just given the CS.  ECHEVESTE told the CS if the CS likes the pills he will sell them for $4.00 per pill.

20.     The drugs seized above have been sent to the DEA Northeast Laboratory in New York and were analyzed by a forensic chemist who determined they contained fentanyl.

### The February 24, 2022 Drug Transaction

21.     During the week of February 21st, ECHEVESTE utilizing cellular telephone number 203-508-2253 exchanged a series of text messages and phone calls with the CS about the fentanyl pills as well as obtaining a kilogram of suspected fentanyl.  ECHEVESTE sent the CS a photograph of what appeared based upon my training and experience to be a kilogram of suspected fentanyl.  The pictured depicted is an off-white brick shaped substance with a Chevrolet bowtie symbol in a vacuum sealed bag.  An additional photograph sent of the suspected kilogram of fentanyl depicts the reverse side with part of the seal undone and some of the substance missing.  Furthermore, the suspected kilogram of fentanyl is placed on a blue cloth with white stripes.  ECHEVESTE and the CS agreed to meet on February 24th to complete the transaction.

22.     At approximately 1:21 pm, the CS called ECHEVESTE to see if he was ready to meet.  ECHEVESTE instructed the CS to meet at 48 Mink Street, Seekonk, MA, which is a motel known as the Colonial Inn.  At this time the CS and the CS's vehicle were searched for contraband which was negative.  The CS was equipped with an audio/video recording device.  Surveillance was then established in the area of 48 Mink St., Seekonk, MA.

23.     At approximately 1:37 pm, investigators observed ECHEVESTE walking back and forth in the front of the Colonial Inn.

24.     At approximately 1:43 pm., the CS arrived at the Colonial Inn and investigators physically and electronically observed ECHEVESTE enter the passenger seat of the CS's vehicle.

The CS and ECHEVESTE drove a loop around the Colonial Inn before parking in front of door labeled "Rooms 157 – 164". ECHEVESTE and the CS exited the vehicle and proceeded through a common door and turned right and entered room labeled "157". Once inside the room, ECHEVESTE began bagging up numerous blue colored pills and handed the pills to the CS. The CS then handed $1,500 of pre-serialized money as a down payment for the pills. Investigators were able to monitor in real-time the drug transaction inside of the room through electronic monitoring equipment the CS had on the CS's person. Investigators noted, the pills that were distributed to the CS appeared to be the same pills and packaging from the February 2nd drug transaction.

25.     At approximately 1:48 pm, investigators observed the CS and ECHEVESTE exited room 157 and reentered the CS's vehicle and departed the area, and investigators followed.

26.     At approximately 2:02 pm, ECHEVESTE was electronically observed making a phone call.

27.     At approximately 2:03 pm, the CS and ECHEVESTE arrived at the New Stop Meat Market located at 1258 Broad Street, Providence, RI 02905. Surveillance physically and electronically observed ECHEVESTE exit the CS's vehicle and enter the New Stop Meat Market. Approximately one minute later, investigators physically and electronically observed ECHEVESTE exiting the market with a weighted plastic bag in his hands. ECHEVESTE then re-entered the CS's vehicle, which subsequently departed the area followed by surveillance directly back to the Colonial Inn at approximately 2:20 pm. Investigators physically and electronically observed ECHEVESTE exit the CS's vehicle with the weighted grocery bag under his arm and proceed back through the door labeled "Rooms 157 – 164".

28.     The CS departed the area followed by investigators to a pre-determined meet location, where the CS relinquished custody of approximately 4,000 pills to investigators. The CS and the CS's vehicle were searched again for contraband which was negative.

29.     During a debriefing of the CS, the CS stated that ECHEVESTE displayed the kilogram of suspected fentanyl to the CS during the ride from the New Stop Meat Market back to the Colonial Inn.  The CS stated that the kilogram appeared to be the same one ECHEVESTE had sent a photograph of displaying the Chevrolet bowtie symbol.  The CS further stated, ECHEVESTE had bagged the approximate 4,000 pills for the CS on the bed inside of Room 157 at the Colonial Inn.

30.     At approximately 3:15 pm, the CS sent a text message to ECHEVESTE informing him that the CS was on the way back to see him because the CS had a "buyer" for the kilogram of suspected fentanyl.  (Investigators had instructed the CS to say that he had a buyer.)  It should be noted that, during the debriefing of the CS at the pre-determined location, additional surveillance units-maintained surveillance of ECHEVESTE.

31.     At this time the CS and the CS's vehicle were searched for contraband which was negative.  The CS was equipped with an audio/video recording device

32.     At approximately 3:24 pm, the CS traveled back to 48 Mink Street, Seekonk, MA followed by surveillance.  Surveillance units at 48 Mink Street, observed ECHEVESTE exit from the area of room 157 with a black Adidas bag.

33.     At approximately 3:28 pm, the CS arrived at 48 Mink Street and surveillance physically and electronically observed ECHEVESTE enter the passenger seat of the CS's vehicle. The CS and ECHEVESTE departed the area followed by surveillance.

34.     At approximately 3:33 pm, surveillance physically and electronically observed the CS and ECHEVESTE park in the parking of the Walmart store located at 1180 Fall River Avenue, Seekonk, MA.  ECHEVESTE then fronted the kilograph of suspected fentanyl to the CS to go meet the CS's buyer.  A few moments later, ECHEVESTE exit the CS's vehicle with the black Adidas bag and entered the Walmart.  The CS departed the area followed by surveillance to a pre-determined meet location, where the CS relinquished custody of the suspected fentanyl pills to investigators.  Investigators noted, the suspected fentanyl was located inside the same grocery bag as observed earlier coming from the New Stop Meat Market.  Furthermore, the

suspected kilogram was wrapped in a blue cloth with white stripes as depicted in the photograph sent to the CS from ECHEVESTE. The kilogram is described as an off-white colored brick shaped substance with a Chevrolet bowtie symbol in a vacuum sealed bag. The reverse side of the kilogram has the seal undone with some of the substance missing. The exhibits where then transported back to the Providence District Office for safekeeping. Investigators conducted a field test on the suspected kilogram of fentanyl. The substance tested presumptive positive for the presence of fentanyl. Agents subsequently weighed the off-white brick of suspected fentanyl and the bag containing it. Although the brick was not weighed separately, the weight of the bag based on appearance and feel was minimal. Even assuming that the bag weighed 50 grams, which is an overestimate, the brick weighed approximately 1 kilogram and well in excess of 400 grams.

35.     On February 28, 2022, investigators established surveillance at 48 Mink Street, Seekonk, MA (Colonial Inn). At approximately 2:15 pm, investigators observed ECHEVESTE exiting the Colonial Inn and approached him. For safety, ECHEVESTE was placed into handcuffs (double locked).   Investigators explained to ECHEVESTE, with the assistance of a Spanish-speaking investigator why they were talking with him. A Spanish-speaking investigator then read ECHEVESTE his Miranda Warnings from a DEA card, which ECHEVESTE verbally acknowledged and waived. Investigators displayed some photographs of the evidence that will be used against him. At this time ECHEVESTE was willing to cooperate and agreed to go to the DEA Providence District Office (PDO). Once at the PDO, ECHEVESTE was read his Miranda Warnings again, agreed and signed the form. Investigators conducted a recorded video and audio interview with ECHEVESTE. ECHEVESTE told investigators he acquired the brick of fentanyl from the New Stop Meat Market located at 1258 Broad Street, Providence, RI. ECHEVESTE stated he gave the fentanyl brick to the CS as well as approximately 4,000 suspected counterfeit Oxycodone pills containing fentanyl. Furthermore, the 4,000 pills were similar color, shape and markings as the 10 pill sample that were acquired

from ECHEVESTE on February 2, 2022.  ECHEVESTE is currently cooperating with investigators.

36.     It should be noted that during the course of the investigation, investigators conducted three additional buys from ECHEVESTE on the following dates:  October 20, 2021, October 21, 2021 and January 4, 2022.   During each of the transactions ECHEVESTE sold the CS a substance that ECHEVESTE told the CS was fentanyl.   The purchased material purchased from ECHEVESTE was  sent to the DEA Northeast Laboratory in New York and was analyzed by a forensic chemist who determined they did not contain any controlled substances. Investigators believe ECHEVESTE was attempting to secure a new source of supply during that time period and was short on money, therefore sold the CS substances marketed as fentanyl to make money.

### Conclusion

37.     Based on the above, I believe there is probable cause to believe that ECHEVESTE distributed in excess of 400 grams of fentanyl in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A).

_____

*Kyle Montagano*

Kyle Montagano, SA
Drug Enforcement Administration

| | Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by **Telephone**          .  (*specify reliable electronic means*) |
|---|---|
| | March 1, 2022 |
| | _____          _____ |
| | *Date*                          *Judge's signature* |
| | **Providence RI** |
| | _____          _____ |
| | *City and State*                **Lincoln D Almond USMJ** |
| | *Printed name and title* |